825 F.2d 538
 23 Fed. R. Evid. Serv. 687
 UNITED STATES of America, Appellee,
v.
Robert D. CRESTA, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
John J. GILLEN, Jr., Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Anthony GRAVALLESE, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Guido IMPEMBA, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Gabriel CARVAJAL, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Ernesto AGUDELO, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Richard T. FORD, Defendant, Appellant.
 Nos. 85-1010, 85-1022, 85-1024 to 85-1028.
 United States Court of Appeals,
First Circuit.
 Argued Sept. 8, 1986.
Decided July 23, 1987.
 
 Philip Castleman, Springfield, Mass., for Robert D. Cresta.
 Robert A. George, Boston, Mass., for Anthony Gravallese.
 John C. McBride with whom McBride, Wheeler & Widegren, Boston, Mass., was on brief, for Guido Impemba.
 Mark Dunlap, Portland, Me., for Ernesto Agudelo.
 Ronald J. Chisholm, Boston, Mass., for Richard T. Ford.
 Margaret D. McGaughey, Asst. U.S. Atty., Portland, Me., with whom Richard S. Cohen, Augusta, Me., U.S. Atty., and Joseph H. Groff, III, Asst. U.S. Atty., Portland, Me., were on brief, for U.S.
 Before TORRUELLA, Circuit Judge, and WISDOM* and ALDRICH, Senior Circuit Judges.
 TORRUELLA, Circuit Judge.
 
 
 1
 This is a consolidated appeal from seven convictions returned in the United States District Court for the District of Maine. Robert D. Cresta, Richard T. Ford, John J. Gillen, Jr., Anthony Gravallese, Ernesto Agudelo, Gabriel Carvajal, and Guido Impemba were charged with eleven others in a two count superseding indictment. Count I charged all defendants with conspiracy to possess with intent to distribute an amount of marijuana in excess of 1,000 pounds in violation of 21 U.S.C. Secs. 841(a)(1), 841(b)(6), 846. Count II charged those same individuals with conspiracy to import a large quantity of marijuana into the United States in violation of 21 U.S.C. Secs. 952(a), 960, 963. The seven appellants were found guilty on both counts, except for defendant Cresta, who was found not guilty on Count II.[1]
 
 Background
 
 2
 The sufficiency of the evidence is important to a number of the issues raised by this appeal. We therefore commence the opinion with a detailed summary of the evidence presented at trial.
 
 
 3
 The tale of misadventure presented at this lengthy trial involved a substantial cast of characters. Jose Montaner, the government's key witness, testified at trial that in 1978 he was working for a shipping company in Miami, Florida when he began to provide agents of the United States Customs Service with information about use of the company's freighters to bring drugs to the United States from Colombia.
 
 
 4
 In 1982, Montaner met defendant Agudelo through Hernando Serrano, a boat captain from Barranquilla, Colombia. Later that year, Montaner delivered money to Serrano for Agudelo. At that point, Agudelo and Montaner discussed plans to obtain a vessel for drug-smuggling.
 
 
 5
 In the fall of 1982, Montaner located the OMAR EXPRESS, a 1,000 ton, long-range capacity vessel, for Agudelo and Alberto Rossi. Observed by agents, Rossi paid Montaner $293,000 in cash for the vessel, which Montaner then gave to the agents. Five thousand dollars of it was deposited in Agudelo's bank account. Upon the completion of this transaction, Agudelo included Montaner in more of his activities.
 
 
 6
 On November 1, 1983, Montaner flew to Panama to meet Agudelo. A DEA agent accompanied Montaner, received regular reports from him, and confirmed that Agudelo and Rossi were in Panama. Agudelo told Montaner that the vessel ADINA, a 5-6000 ton freighter, was already off the coast of Colombia loaded with marijuana concealed under cement. It was ready to deliver the marijuana to the northeast coast of the United States, but was stalled as a result of United States military action in Grenada. Agudelo went to Bogota, Colombia, but called Montaner in Panama daily to inquire about the status of the troops in Grenada. With Montaner's help, Agudelo hired Eduardo Peterson from Barranquilla, Colombia to take the ADINA to Boston, Massachusetts.
 
 
 7
 Agents confirmed that Montaner returned to the United States on November 17, 1983. Agudelo used a portable radio Montaner had on his car to communicate with Enrique Coronado, the supplier of the marijuana, in Barranquilla. Agudelo then asked Montaner to take the radio and antenna at Agudelo's expense to Boston. Observed by the agents, Montaner, with his equipment, met Agudelo and defendant Carvajal at the Ft. Lauderdale airport on November 20. Thereafter, agents also observed the three arrive in Boston, where they were met by Gravallese and Rossi.
 
 
 8
 Agents followed Agudelo, Carvajal, Gravallese, Rossi, and Montaner to the rented home of Impemba and his girlfriend, Sherree Rogers, on Governor's Island, near Laconia, New Hampshire. The group visited with Impemba for three days. There the group looked at nautical charts and discussed the arrival of the ADINA. Agudelo said the vessel was loaded with 1,247 bales of marijuana weighing 48-52 pounds each and wrapped in Marlboro cigarette boxes.
 
 
 9
 Montaner rented a car and allowed the agents to install a tracking device on it. Assisted by Gravallese and a person named "Tommy," Montaner also installed on the car the radio and antenna he had brought from Miami.
 
 
 10
 Two days before Thanksgiving, on November 22, Montaner went with Gravallese, Impemba, Carvajal, Agudelo, and Rossi to Augustine's restaurant in Saugus to meet with the people who had been hired to unload the marijuana. Agents observed and photographed the meeting. Agudelo said he had already advanced $62,000 to the man in charge of the unloading crew, whom he described as "King Kong." While agents observed Montaner and Gravallese alone at a table, the latter told Montaner he worked at Augustine's and its owner and employees knew of the imminent arrival of marijuana and wished Gravallese well.
 
 
 11
 Eventually Porter and Cresta, the off-loaders, arrived at the restaurant and, observed by the agents, met with Impemba, Agudelo, Carvajal, and Rossi. Agudelo later told Montaner he gave Porter an additional $30,000, bringing the total already paid the off-loaders to $92,000. Agudelo complained that the unloaders "better start doing something." When Porter and Cresta left, agents followed Montaner, Carvajal, and Agudelo to Logan Airport, where they met Merlo, their radio contact in Miami.
 
 
 12
 On the return trip to Governor's Island, Impemba gave Agudelo $5-10,000 cash and explained how to use credit cards at pay telephones to make calls that could not be traced. Agents saw Agudelo repeatedly using pay telephones, occasionally in the company of Carvajal.
 
 
 13
 During the stay at Governor's Island, Montaner was told by Agudelo that the supplier of marijuana was Enrique Coronado from Barranquilla, Colombia and that Impemba represented the buyers and Carvajal was the financier of the operation.
 
 
 14
 On November 23 or 24, Agudelo reported to Montaner that he had learned from Coronado in Barranquilla that the arrival of the ADINA was imminent. A radio frequency of 14.460 megahertz and code names for Agudelo, the ADINA, and the Barranquilla contact were agreed upon to avoid detection. Coronado would be "Rata"; the ADINA would be "Alcon", "Halcoln", or "Pluma Blanca"; Agudelo would be "Manolo." Montaner passed this information to the investigators, who began to monitor the group's radio transmissions.
 
 
 15
 The ADINA was now expected to arrive a day or two after Thanksgiving. According to Agudelo, another vessel would meet the ADINA and its sixteen-man crew 200 to 300 miles off the coast of Maine and would bring the marijuana to a point in mid-coast Maine near a Coast Guard Station. However, bad weather continued to postpone the arrival of the ADINA. By November 25, Agudelo reported that the vessel was headed north to Canada and south from there to avoid attracting law enforcement attention. Later that same day, on instructions from Agudelo, Montaner drove Carvajal to New Hampshire to speak with Impemba about problems with the unloading plans.
 
 
 16
 Agents, documents, and photographs confirmed that the group took a room at the Margate Hotel in Laconia. Carvajal located pay telephones through which information could be relayed to Agudelo who, agents confirmed, was staying with Gravallese at the Colonnade Hotel in Boston and was himself repeatedly using pay telephones. Gravallese dismissed Montaner's concerns about the $100 per day charge for the room at the Colonnade Hotel and bragged that after the ADINA operation was completed, he would build an eight bedroom home where the conspirators could stay as his guests. Agudelo reported to Montaner that Carvajal was unable to speak with Impemba because Impemba was with the buyers of the marijuana.
 
 
 17
 As time passed, Agudelo complained to Montaner about emerging difficulties with Rossi, who was demanding more money. To mediate the situation, Agudelo arranged for a mutual friend named Leo Figarito, to come from Miami to Boston. Followed by the agents, Montaner was sent to the airport to pick up the intermediary. Since Montaner did not know Figarito, he met each of the possible flights from Miami with a sign that read "Are you Leo." When Montaner finally located Leo and identified himself as having been sent by Agudelo, Leo angrily complained about the use of the sign, saying that the area was "hot." During his brief stay in Boston, Leo rented a car for which Agudelo paid cash and insisted that the credit card slip be destroyed.
 
 
 18
 On November 27, agents followed Figarito, Montaner, Agudelo, Agudelo's family, and three others back to Governor's Island. Gravallese joined them. Montaner became alarmed when the tracking device the agents had installed on his rented car repeatedly activated Impemba's electronic garage door. Impemba gave Agudelo another $5-10,000 and instructed him to go with Montaner to Maine, where the unloading would occur. Rossi told Impemba and Agudelo that "King Kong" had left to take fresh water and cold weather clothing to the ADINA crew.
 
 
 19
 The next day, agents observed the off-loaders, Porter, McCauley and Gillen, in Gloucester, Massachusetts. They examined what appeared to be a chart before Porter went to his vessel "Manford Porter." From there, agents followed Gillen and McCauley to Rockland, Maine where surveillance was terminated when it appeared that Gillen and McCauley had detected it.
 
 
 20
 On November 29, agents photographed Agudelo meeting his and Carvajal's friend, Sarno, first at Logan Airport and then at the Townhouse Motel outside Boston. Montaner served as interpreter when Agudelo and Sarno discussed finding a safe place for three of the ADINA crewmembers, who were relatives of Coronado's, to stay in the United States after the venture was completed.
 
 
 21
 That day Montaner again accompanied Agudelo to Logan Airport. Agents photographed them meeting Rossi, who had arrived from New York, and followed them around Boston. Observed by the agents, Agudelo tried unsuccessfully to contact the ADINA by radio from the roof of the airport garage. Agudelo bragged to Montaner that he expected to make $10 to $12 million because the conspirators had themselves financed the entire venture, including the off-loading crew, the vessel, the marijuana, and daily expenses.
 
 
 22
 By December 1, Merlo, the conspirator in Miami, relayed to Agudelo complaints that the ADINA crew was short of water, fuel, and clothing. Agudelo responded that a 53' Bertram racing vessel in New York could deliver the needed supplies. He asked Montaner to find an American crew to make the delivery, then continue on to Colombia to pick up another load of marijuana. Meanwhile, agents in Gloucester saw Porter load food, water and clothing into his boat.
 
 
 23
 On December 5, while at an apartment in Revere, Massachusetts, Montaner translated a conversation between Agudelo and Sarno, in which Agudelo stated that he was having serious problems with Porter concerning the off-loading of the ADINA. Agudelo wanted to know if Sarno knew of anyone who could handle the unloading operation. Later in the day there was another meeting which Montaner translated between Agudelo, Sarno and two men known as Michael and Buckley who had been contacted by Sarno. The meeting was further continued to 7:30 that evening so that Michael and Buckley could obtain charts. During the latter meeting Carvajal was present.
 
 
 24
 A meeting was held on December 6 with Agudelo, Carvajal and Montaner present in which digital scales, tapes and some magic markers were observed in the trunk of an automobile.
 
 
 25
 On either December 6 or 7, Agudelo had a conversation with Montaner concerning Merlo's father being upset that his son was relaying radio communications. It was agreed that Montaner would fly back to Miami to relay the communications to the ADINA. During the transmission of the communication, Montaner recorded certain conversations he had with Edwardo Peterson, Captain of the ADINA.
 
 
 26
 On December 6, 1983, the Coast Guard began surveillance of the ADINA in the Gulf of Maine. Independently, on December 8, Robert Kenney, a Rockland fisherman under federal indictment in Maine on smuggling charges, approached agents with information about the projected delivery to Maine of 50,000 pounds of marijuana on December 10, 1983. After signing a cooperation agreement, Kenney agreed to act under cover and to have any telephone calls he placed be recorded.
 
 
 27
 Kenney told the agents that George Trundy had asked Kenney to provide a fishing vessel to meet a large blue freighter with a white wheelhouse waiting at a location in the Gulf of Maine where the agents knew the ADINA to be. Kenney was to bring 50,000 pounds of marijuana wrapped in burlap and hidden under a load of cement, from the freighter to other conspirators on shore. Trundy had told Kenney his boss was a Gloucester, Massachusetts fisherman who was "big, tall, rugged and mean," who was later identified as Porter. At trial, Trundy also testified for the government. He testified that in the summer of 1983, he met Gillen and Porter, who asked him to find a vessel and a place to unload marijuana from a mother ship in the Gulf of Maine. Trundy testified about subsequent meetings with Porter and Gillen, and about the inclusion of Kenney.
 
 
 28
 On December 9, a Coast Guard cutter sighted the ADINA. The cutter followed the vessel until December 10, when they obtained permission from the captain of the ADINA to board and search the vessel. Marijuana was discovered. The Coast Guard personnel were then requested by the Captain of the ADINA to leave the vessel. The Coast Guard personnel complied and continued to follow the vessel. During this time the radio frequency was jammed so that the vessel could not communicate with any off-load people.
 
 
 29
 Pending permission from the Republic of Panama to reboard the ADINA, the Coast Guard observed bales of marijuana being thrown overboard. Fourteen bales were subsequently retrieved by the Coast Guard. When permission was finally obtained from Panama to reboard the ADINA, the vessel was commandeered by the Coast Guard and brought to Boston.
 
 
 30
 In order to identify who was awaiting the intercepted delivery, investigators arranged for a decoy fishing vessel manned by agents to arrive on signal at the location Kenney said was the intended off-loading site. At 3:00 a.m. one of the conspirators spotted the decoy boat and went to alert the others who were asleep in their hotel rooms nearby. The defendants were thereupon arrested in their rooms and a multitude of weapons were seized.
 
 
 31
 The appellants raise eleven issues which we will consider seriatim.
 
 I. Peremptory Challenges
 
 32
 During the jury selection process, appellants allege that the prosecutor systematically challenged most jurors between the ages of 18 and 34. Nevertheless, the jury that tried the case in fact had one member under 30 and two under 35. All of the defendants objected at trial contending that the exclusion of young adults constituted age discrimination and violated the defendants' right to an impartial jury drawn from a cross section of the community. The trial court rejected these contentions and ruled that the prosecutor's use of its challenges was acceptable under Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).
 
 
 33
 In Barber v. Ponte, 772 F.2d 982, 996-1000 (1st Cir.1985) (en banc), this court thoroughly analyzed the case law on the subject of peremptory challenges, and held that young adults do not constitute a "cognizable group" for the purpose of an Equal Protection challenge to the composition of a petit jury. See also United States v. Lynch, 792 F.2d 269 (1st Cir.1986).
 
 
 34
 Appellant argues that the issue should be re-evaluated in light of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). However, nothing in Batson undermines the vitality of this court's holding or the ruling below. At issue in Batson was the systematic use of peremptory challenges to exclude black jurors from the trial of a black defendant. Such a situation presents issues of discrimination against a cognizable group which has received judicial protection because of historical discrimination. Batson gives no indication of extending to young adults such a principle nor do we believe it warranted. See Barber v. Ponte, supra.
 
 
 35
 II. Government Informant's Alleged Contingent Fee Agreement
 
 
 36
 Appellants assert that the trial court erred when it denied their motion to suppress the testimony of the government's paid informant, Jose Montaner, thereby violating their Sixth Amendment right to a fair trial and their Fifth Amendment right to due process.
 
 
 37
 The case against defendant Impemba and the other conspirators was developed through the investigative work of Montaner. Prior to trial, Montaner received approximately $17,000 from the Drug Enforcement Administration for providing information from 1983 to 1984, and $36,000 to relocate himself and his family under the Witness Protection Program, including monthly subsistence expenses, for a total of $53,000 received from the Government.[2] In addition, he expected to receive a potential maximum of $50,000 from the sale of the ADINA, which was seized on the strength of information he provided.[3] There was no written agreement regarding the arrangement between Montaner and the government; however, their oral understanding and the issue of rewards was fully explored on cross-examination. Also, a full accounting of all payments or benefits to Montaner was provided to defense counsel in writing before the trial began.
 
 
 38
 After carefully considering the briefs and the record in this case, we conclude that no reversible error exists as to the admission of Montaner's testimony.[4] A contingent fee arrangement is not per se impermissible; on a case by case basis, varying factors determine whether the arrangement in question is permissible. The "fee for services" can either be in the form of leniency, United States v. Dailey, 759 F.2d 192 (1st Cir.1985), or direct financial compensation, as here. Williamson v. United States, 311 F.2d 441 (5th Cir.1962).
 
 
 39
 In United States v. Dailey, this court reaffirmed the long standing principle that the testimony of interested informants is not so inherently unreliable that it must be excluded. 759 F.2d at 196. Frequently, insiders are the only source of information about criminal activity, and the government has a legitimate law enforcement interest in procuring their cooperation. Id. While the risk of perjury is recognized, courts have chosen to rely upon cross-examination to ferret out any false testimony. Id. Rather than adopting an exclusionary rule, courts have chosen to leave the matter to the jury to consider in weighing the credibility of the informant. United States v. Grimes, 438 F.2d 391, 396 (6th Cir.), cert. denied, 402 U.S. 989, 91 S.Ct. 1684, 29 L.Ed.2d 155 (1971) (refusal to exclude testimony of informant paid under contingent fee agreement for conviction of specified persons for crimes not yet committed).
 
 
 40
 There are established safeguards that must be followed to ensure the veracity of the witness: the jury must be informed of the exact nature of the contingency agreement; the defense counsel must be permitted to cross-examine the witness about the agreement; and the jury must be specifically instructed to weigh the witness' testimony with care. See, e.g., Dailey, 759 F.2d at 196; United States v. Insana, 423 F.2d 1165, 1169 (2d Cir.1970). We believe these safeguards were adhered to in the instant case. The full nature of rewards to Montaner was presented to the jury in the government's direct case,[5] and was also explored extensively on cross-examination. Prior to trial, the government provided defense counsel with a written memorandum detailing all payments and benefits to Montaner. In the final instructions, the trial court gave the jury the appropriate standard against which to weigh the credibility of Montaner's testimony. See Dailey, 759 F.2d at 200. The jury was given the accomplice instruction on three occasions and was told to focus particularly on motives Montaner might have to lie, such as promises or benefits.
 
 
 41
 The final safeguard employed by the courts is whether the informant's testimony was corroborated. See, e.g., United States v. Dailey, 759 F.2d at 198; United States v. Bithoney, 631 F.2d 1, 5 (1st Cir.1980); United States v. Miceli, 446 F.2d 256, 258-59 (1st Cir.1971); Lyda v. United States, 321 F.2d 788, 794-95 (9th Cir.1963). There is, of course, no federal evidentiary requirement that an accomplice's testimony be corroborated. See United States v. Barrett, 766 F.2d 609 (1st Cir.1985). Unless an accomplice's testimony is "incredible or unsubstantial on its face," which is not the case here, his uncorroborated testimony may be admitted, "even though the accomplice is in a position to gain favors from the government by his testimony." United States v. Dailey, 759 F.2d at 198 (quoting Lyda v. United States, 321 F.2d 788, 794-95 (9th Cir.1963)). Nevertheless, the evidence here fully satisfies any suggested safeguard of corroboration. Agents followed Montaner throughout his investigation and confirmed minute details of his testimony, from the various meetings he held with the different defendants, to the names of hotels where the defendants stayed, the types of cars rented, and the use of codes and content of radio transmission. Other accomplices who never met Montaner, gave accounts of this conspiracy from the offloaders' perspective that confirmed Montaner's testimony. The corroboration included such details as the geographical coordinates for the location of the ADINA at sea and testimony attributing the delay in the arrival of the marijuana to the presence of American military forces in Grenada.
 
 
 42
 The extent of the corroboration of Montaner's testimony, plus the fact that the jury was fully informed of the nature of the agreement, the thorough cross-examination about the agreement, and the specific instructions admonishing the jury to weigh the accomplice's testimony with care, are sufficient safeguards to outweigh the risk of inducing perjury that is present in any contingency fee agreement and ensure that the defendants were not denied their right to a fair trial.[6]
 
 
 43
 Appellants also argue that (1) Montaner's agreement was contingent upon the conviction of the defendants; (2) Agudelo was pre-targeted; and (3) the defendants were entrapped.
 
 A. Agreement Contingent Upon Conviction
 
 44
 Courts have generally allowed paid informants to testify as long as the agreements are not contingent upon the conviction of particular persons. United States v. Palow, 777 F.2d 52, 54 (1st Cir.1985).
 
 
 45
 In United States v. Grimes, the Sixth Circuit said:
 
 
 46
 No such overriding policy is present when an informer is paid on a contingent fee agreement for the conviction of specified persons for crimes not yet committed. Although it is true that the informant working under this type of arrangement may be prone to lie and manufacture crimes, he is no more likely to commit these wrongs than witnesses acting for other, more common reasons. Frequently, for example, one co-defendant testifies against another co-defendant with the expectation of favorable treatment as a reward for his testimony. Like the informant being paid on a contingent fee basis, a co-defendant so testifying may feel it imperative to obtain a conviction of his co-defendant in order to improve his own position. Similarly, informants paid on bases other than a contingent arrangement may feel that their employment will be terminated if they do not bring about a conviction. Therefore, despite admonitions to the contrary, they may believe that their future employment as an informant depends on the manufacture of crimes in order to prove their worth to the government. Neither of these methods of 'paying' informers has been seriously attacked by the courts; yet the potential for abuse is obvious in each case. Rather than adopting an exclusionary rule for a particular factual situation, irrespective of the mode of payment, we prefer the rule that would leave the entire matter to the jury to consider in weighing the credibility of the witness-informant (Citation omitted). In our view this approach provides adequate safeguards for the criminal defendant against possible abuses since the witness must undergo the rigors of cross-examination.
 
 
 47
 438 F.2d at 395-96. This court has agreed with the Sixth Circuit's "general policy and reasoning" although we refrained from stating "whether or not we would go as far as the Sixth Circuit with respect to the testimony of informants." United States v. Dailey, 759 F.2d at 200. Here also we agree with the general policy and reasoning, but we distinguish the facts of this case from that of Grimes. In Grimes, the government explicitly promised the informer a reward for each conviction he made possible. The government made no such promise here and we would not condone such an agreement.
 
 
 48
 Montaner received the bulk of his compensation prior to trial; thus payment of this sum was not contingent upon the conviction of any of the defendants. See United States v. Shearer, 794 F.2d at 1549. Montaner did make an isolated statement on cross-examination that he expected more generous treatment from the government if the defendants were convicted. However, the agents who supervised Montaner made clear that the important factor in determining what he received was nothing more specific than the nature and extent of his cooperation. For investigative work in an unrelated case, Montaner received $30,000; there have been no convictions or arrests made in that case, yet Montaner was rewarded. There was no reason then, for Montaner to believe his payment in this case would be contingent upon a conviction, nor was it. Montaner's isolated statement was not the product of a government promise.[7]
 
 
 49
 When reviewing the entire testimony of the witness on this specific issue, which spanned over fifty pages of transcript, it appears that this one isolated statement was a product of confusion due to persistent cross examination. The witness repeatedly denied this assertion, both before and after the unfortunate statement was made.[8] Also, as the witness was born and raised in Spain, he did not have a strong command of the English language. The witness' isolated remark, which conflicted with the rest of his extensive testimony, viewed in the context of his testimony as a whole on this issue, combined with the language factor, leads us to believe that it should not be relied upon as a true reflection of the witness' belief. Montaner's testimony as a whole convinces us that the agreement between himself and the government, as understood by both, was not contingent upon the outcome of the case or whether there were any convictions, but rather upon his "cooperation" with the government.
 
 B. Pre-targeting
 
 50
 In Williamson, 311 F.2d 441, the court overturned the convictions of the defendants because the informant in the case was to be paid a certain sum of money for each pre-targeted individual that was caught in a crime set up by the informant. The court stated that the pre-targeting of individuals would have been permissible if the government had demonstrated a prior knowledge that the defendant was engaged in illegal dealings. 311 F.2d at 444. Subsequent to Williamson, courts have seized upon this dicta and have been careful to confine its result to situations where a contingent fee is paid for the investigation of a pre-selected individual against whom the government lacks prior knowledge of his unlawful activity. See, e.g., United States v. Dailey, 759 F.2d 192, 199 (1st Cir.1985); United States v. Carcaise, 763 F.2d 1328, 1332 n. 11 (11th Cir.1985); Hill v. United States, 328 F.2d 988, 989 (5th Cir.1964); United States v. Gray, 626 F.2d at 499. Although the evidence in the instant case is conflicting, it appears that the government expressed considerable interest in Agudelo to Montaner. Even assuming Agudelo was pre-targeted, the government did have a reasonable basis for believing he was involved in criminal activity. See Harris v. United States, 400 F.2d 264, 266 (5th Cir.1968) (pre-targeting individuals is permissible if "reasonable suspicion" of illegal activity). At trial, Agudelo's motion to suppress evidence of his prior criminal history was granted because of the risk of undue prejudice. Agudelo cannot now come forward and claim there was no prior knowledge. And certainly, Agudelo was not the exclusive focus of Montaner's investigation. Montaner had previously testified at unrelated trials and expected to do so again in the future.
 
 C. Entrapment
 
 51
 Williamson has also been limited to situations involving entrapment. United States v. Dailey, 759 F.2d at 199. The test for entrapment is whether the government "actually implants the criminal design in the mind of the defendant." United States v. Russell, 411 U.S. 423, 436, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973). The informant can approach the defendant first and "simply offer [him] the opportunity for a sale," as long as there is no inducement to commit a crime. Williamson, 311 F.2d at 444. Although there is conflicting evidence as to whether Montaner approached defendant Agudelo first or vice-versa, it is clear that there was no entrapment here. Montaner offered his services in obtaining a vessel and thereby became involved in a criminal operation that was already in progress. When Montaner went to Panama at Agudelo's request, Agudelo told him that another vessel, the ADINA, was at sea, loaded with marijuana, and ready to make a delivery.
 
 
 52
 Finally, we note that the amount paid to Montaner is a large sum, properly subject to scrutiny by this court, although not contested by appellants. See, e.g., United States v. Shearer, 794 F.2d 1545, 1549 (11th Cir.1986) (payment of $31,000 for five-month undercover investigation, plus 25% of future sale of forfeited drug smuggling vessel, is not exorbitant); United States v. Garcia, 528 F.2d 580, 587 (5th Cir.), cert. denied, 429 U.S. 898, 97 S.Ct. 262, 50 L.Ed.2d 182 (1976) (payment of $31,675 in eighteen months did not of itself mandate reversal, but amount did require scrutiny and created doubt "as to the propriety of the practice of so heavily subsidizing informants"); United States v. Gray, 626 F.2d 494, 499 (5th Cir.1980), cert. denied, 449 U.S. 1091, 101 S.Ct. 887, 66 L.Ed.2d 820 (1981). Montaner was paid $17,000[9] over a period of one year, plus the potential $50,000 from the sale of the vessel. The investigation exposed him and his family to many risks and dangers, and considering its duration, we do not find the sum to be excessive.
 
 
 53
 III. Testimony Regarding Defendants' Prior Imprisonment
 
 
 54
 Appellants argue that the district court erred in denying their motion for mistrial after the government witness, Montaner, testified that defendants Impemba and Carvajal met at the Federal Penitentiary. We disagree.
 
 
 55
 Prior to the start of the second day of trial, defense counsel made an anticipatory objection to prohibit any testimony regarding Impemba and Carvajal having previously met while incarcerated. The court ruled that under Federal Rule of Evidence 403 the prejudicial effect of such evidence outweighed any possible probative value it might have. The United States attorney instructed the witness on two occasions to omit that reference.
 
 
 56
 The trial involved 21 days of testimony during a seven week period. On the second day of trial, the government's witness, Montaner, began his testimony. When Montaner testified "they met up ...," appellants objected and a bench conference ensued. The court overruled the objection and directed that the question be re-read. The prosecutor asked the witness if he was finished, and he replied, "May I have a second with counsel? Can I?" Defense counsel objected and the witness' request was denied. Montaner then said, "The answer, should I continue? That he also told me that he knew Guido and he met him at the Federal Penitentiary." Defense counsel immediately moved for a mistrial, which was denied. The court found that Montaner had become confused and that there had been no deliberate introduction of prior bad acts. The trial judge gave explicit curative instructions telling the jury to completely disregard the testimony, and then repeated the instructions two other times that day. The record indicates that in a poll of the jury, only half of the jury had heard Montaner's statement.
 
 
 57
 We agree with the district court that the government's evidence of prior incarceration was inadmissible due to its highly prejudicial character. The issue here is whether it was necessary to retry the case or whether a cautionary instruction was adequate. To require a new trial, we must conclude that, despite the trial judge's instructions, Montaner's reference to prior incarceration was likely to have affected the jury verdict. United States v. Johnston, 784 F.2d 416, 424 (1st Cir.1986) (comments by government witness at trial of defendants charged with conspiracy to import marijuana, that defendants were involved in other deals, was cured by cautionary instructions; any remaining prejudice could not have affected outcome). We must examine the context of the improper remark, whether it was deliberate or accidental, the likely effect of the curative instruction, and the strength of the evidence against the appellants. United States v. Capone, 683 F.2d 582, 586 (1st Cir.1982) (prosecutor's closing remarks were improper but did not require reversal).
 
 
 58
 First, Montaner's comment was isolated. It was the only reference made to the defendants' prior incarceration during a seven week trial and Montaner's testimony itself comprised the majority of it. See United States v. Johnston, supra; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1939); United States v. Capone, supra, 683 F.2d at 586.
 
 
 59
 Second, as the trial court found, Montaner's remark was inadvertent and does not seem to have been made in bad faith. Nor did the prosecutor deliberately elicit this remark. United States v. Capone, supra, 683 F.2d at 586.
 
 
 60
 Third, the trial judge gave a strong, explicit cautionary instruction to completely disregard the statement. This instruction was sufficient to counteract prejudice that may have flowed from Montaner's remark. United States v. Johnston, supra, 784 F.2d at 425.
 
 
 61
 Finally, any remaining prejudice could not have affected the outcome of this case. The evidence against the two defendants[10] was very strong if the jury believed Montaner. His testimony was detailed, basically consistent, and corroborated by government surveillance and documents.[11] The jury's verdicts could hardly have been the result of Montaner's isolated remark, but rather were based upon lengthy testimony and a reasonable belief that Montaner was credible. United States v. Johnston, supra, 784 F.2d at 425; see also United States v. Capone, supra, 683 F.2d at 587. We therefore find that Montaner's remark about prior incarceration did not prejudice appellants Impemba and Carvajal.
 
 IV. Sufficiency of the Evidence
 
 62
 Appellants claim that there was insufficient evidence presented at trial. On appeal, the evidence and reasonable inferences from it are to be viewed in the light most favorable to the government. See United States v. Hyson, 721 F.2d 856, 860 (1st Cir.1983). Based on a review of the record, we find that there was sufficient evidence to connect all appellants to the charges of which they were convicted. Because appellant Impemba's claims were, relatively speaking, more compelling, we address them further.
 
 
 63
 Montaner, the government informant, testified that he attended a meeting of the conspirators at Impemba's home, where they stayed for two days. During this stay, Montaner never personally spoke with Impemba, however he did make several observations. He observed Impemba and three of the defendants looking over a nautical chart, which Impemba then kept. Montaner observed Impemba giving money to defendant Agudelo, although he did not know the quantity. Montaner testified that Agudelo had told him that Impemba was an agent for the buyers of the marijuana, that Impemba had said that the police monitor radios, and that Agudelo and Impemba were going to Boston to meet with the off-loaders. Agudelo and Impemba did proceed to Boston to meet the offloaders at a restaurant.
 
 
 64
 In addition to Montaner's testimony, circumstantial evidence connected Impemba to this conspiracy. See United States v. Bithoney, 631 F.2d 1, 5 (1st Cir.1980). Agents corroborated Impemba's presence at the restaurant meeting in Boston and at various other meetings of the conspirators. Impemba was in town the day the marijuana was scheduled to arrive and stayed in the same hotel as the other conspirators. The automobile he was driving was later found to contain scales, tape, magic markers and other equipment used in preparing marijuana for distribution. Finally, telephone toll records connected Impemba with a number of the other defendants. The evidence does not show an innocent association with other conspirators, but rather that Impemba had a close working relationship with them. See United States v. Edwards, 602 F.2d 458, 471 (1st Cir.1979).
 
 
 65
 Appellant Impemba's argument is three-pronged. Appellant alleges, first, that the court erred in admitting, under Fed.R.Evid. 801(d)(2)(E), the government informant's hearsay testimony. Second, even assuming that the court properly admitted the hearsay testimony, appellant asserts that there was insufficient evidence presented to prove that he knowingly and willfully joined any conspiracy. Third, even assuming that he conspired to import marijuana, appellant argues that there was insufficient evidence to prove that he conspired to possess with intent to distribute marijuana.
 
 
 66
 Appellant argues that the statements made by Impemba to Agudelo, who in turn told Montaner, were hearsay and thus inadmissible. Federal Rule of Evidence 801(d)(2)(E) provides, in pertinent part, that a "statement is not hearsay if ... the statement is offered against a party and is ... a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." In order for a statement to be admissible under the above rule, the court must make a determination that it is more likely than not that the declarant and the defendant were members of a conspiracy in furtherance of which the hearsay statement was made. United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir.1977); United States v. Baines, 812 F.2d 41 (1st Cir.1987). The trial court made each of these findings as required and we conclude that they were not clearly erroneous. See United States v. Patterson, 644 F.2d 890, 894 (1st Cir.1981). The fact that the court considered the hearsay itself in making its Petrozziello findings is permitted under the law of this circuit, as long as the independent, non-hearsay evidence is "sufficient to show, more likely than not" that a conspiracy existed. United States v. Crooks, 766 F.2d 7, 11 (1st Cir.), cert. denied, 474 U.S. 996, 106 S.Ct. 421, 88 L.Ed.2d 362 (1985); see also United States v. Johnston, 784 F.2d 416, 422 (1st Cir.1986). We are satisfied that the independent evidence was sufficient to establish a conspiracy.
 
 
 67
 Impemba was convicted of conspiring to import marijuana and conspiring to distribute marijuana. The evidence is sufficient to convict on both counts. Impemba particularly questions the sufficiency of the evidence on the distribution count. The issue is whether Impemba possessed the requisite awareness of the distribution conspiracy and evidenced an intent to join it. United States v. MacDougall, 790 F.2d 1135, 1152 (4th Cir.1986). Montaner identified Impemba as the agent for the buyers of the marijuana, the person through whom the drug would be put into commerce. Impemba was in the area of the off-load site on the expected date of delivery and had with him equipment used in preparing marijuana for distribution. The complex nature of this operation and the large amount of marijuana confiscated belie Impemba's contention that he did not intend to transfer the drugs to other persons. United States v. Taylor, 683 F.2d 18, 21 (1st Cir.1982).
 
 V. Disclosure of Hospital Records
 
 68
 Appellant Cresta asserts that the district court erred in denying his request for disclosure of the hospital records of Robert Kenney, a government witness. Kenney was hospitalized for alcohol and drug abuse one month after Cresta's arrest. Prior to trial, the government informed defense counsel when, where, and under what name Kenney had received treatment. There was extensive testimony, on direct and cross examination, establishing that Kenney had used cocaine during the crime itself and had abused alcohol and drugs for a number of years, as well as on the potential effects of these excesses on his memory in regards to the events about which he had testified.
 
 
 69
 Both the statute invoked by Cresta and the governing regulations carry a strong presumption against disclosing records of this kind. 42 U.S.C. Sec. 290ee-3(a). The express purpose of this provision is to encourage patients to seek treatment for substance abuse without fear that by so doing, their privacy will be compromised. See 42 C.F.R. Sec. 2.64(f). See also United States v. Graham, 548 F.2d 1302, 1314 (8th Cir.1977). If the patient fails to give prior written consent, records of treatment may only be disclosed after the court looks at the applicant's "good cause" and balances the public interest and the need for disclosure, against the injury to the patient, to the physician-patient relationship, and to the treatment services. 42 U.S.C. Sec. 290ee-3(b)(2)(C). The burden was on Cresta to establish good cause for the release of the records. The court below found that this burden was not met. Considering the extensive direct and cross-examination on the subject, we agree.
 
 
 70
 Witness Kenney's addiction to drugs and alcohol was fully disclosed by his own testimony and little else would have been gained from an examination of the records. We believe the appellant was fully able to present the witness' state of mind and mental and physical condition to the jury without these records.
 
 
 71
 VI. Agent's Reference to Previous Knowledge of Defendant
 
 
 72
 During cross-examination of agent Kinsel, the agent stated, "all I can say is I knew of [Agudelo] before this investigation." Counsel for Agudelo immediately moved for a mistrial, which was denied on the basis that counsel had clearly invited the response. The court offered to give a limiting instruction, but counsel declined.
 
 
 73
 It is apparent from the record that defense counsel did elicit the response, although perhaps inadvertently, and cannot now complain of the alleged error. See United States v. Burnett, 418 F.2d 912, 913 (9th Cir.1969). Furthermore, the statement is not so prejudicial as to have required a mistrial. There is no suggestion that the agent's prior knowledge of Agudelo was in connection with prior bad acts or even had bad connotations. See United States v. Fosher, 568 F.2d 207, 212 (1st Cir.1978). The remark was isolated and buried within six weeks of evidence. We do not believe the remark in any way affected the outcome of defendant Agudelo's verdict. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 240, 60 S.Ct. 811, 852, 84 L.Ed. 1129 (1940).
 
 VII. Warrantless Entry and Search
 
 74
 Appellants Ford and Cresta argue that the district court erred in holding that the warrantless entry and seizure of evidence was justified by exigent circumstances.
 
 
 75
 Appellants were arrested on December 11, 1983 at 3:45 a.m. in a hotel room in Rockland, Maine. Appellants Ford and Cresta were two out of eighteen defendants originally arrested in this large drug smuggling operation. Although agents had been surveilling the operation for a few months, they did not become aware of Ford and Cresta's involvement until December 9, 1983, when one of the smugglers, Robert Kenney, decided to cooperate with the government. Thereafter, the officers recorded seven telephone calls placed by Kenney on December 9 and 10. Kenney was told that the "off-loaders" would be staying at the Navigator Motel in Room 106. A phone call to the hotel room confirmed this information. The last phone call was placed at 8:00 p.m. on December 10. The marijuana delivery was scheduled to arrive that night. However, Coast Guard officials had already boarded the vessel, discovered the marijuana and arrested the crewmembers. A decoy boat was sent to the off loading spot at about 3:00 a.m. on December 11 and one of the defendants went to notify the other conspirators sleeping at the Trade Winds Motel. Agents then arrested a number of defendants in their hotel room and there found two portable two-way radios. Minutes later agents arrived at the Navigator Motel and knocked on the door of Room 106, which was dark and silent. Cresta opened the door slowly and the agents pushed past him and arrested him and Ford.
 
 
 76
 The district court held that there were exigent circumstances justifying the warrantless entry and arrests of Ford and Cresta. The guns and other evidence found were held to be admissible under the plain view exception to the warrant requirement, see Coolidge v. New Hampshire, 403 U.S. 443, 464-66, 91 S.Ct. 2022, 2037-38, 29 L.Ed.2d 564 (1971), or under the exception that permits a search for weapons incident to arrest, see Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). We affirm.
 
 
 77
 Warrantless searches and seizures are constitutionally impermissible unless supported by probable cause and justified by either exigent circumstances or another recognized exception to the Fourth Amendment warrant requirement. Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). In this circuit, the test for determining whether exigent circumstances exist justifying a warrantless entry "is whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." United States v. Adams, 621 F.2d 41, 44 (1st Cir.1980). At the time of the arrests of Ford and Cresta probable cause and exigent circumstances did exist. The agents had a reasonable belief that the defendants arrested at the other hotel had used the two-way radio to warn Ford and Cresta, and they would attempt to flee or to destroy evidence.
 
 
 78
 Appellants however, contend that the officers had acquired sufficient information in the early evening of December 10 to have obtained a search warrant at that time. The officers certainly had probable cause to obtain a warrant after the last recorded phone call was made at 8:00 p.m. on December 10. Clearly this would have been the better course, but it does not follow that the chosen one was fatal.
 
 
 79
 Although probable cause existed some time prior to the arrests, this does not negate the rise of exigent factors. Here exigent factors did arise and it does not matter when they did. United States v. Mitchell, 538 F.2d 1230, 1233 (5th Cir.1976) (en banc), cert. denied, 430 U.S. 945, 97 S.Ct. 1578, 51 L.Ed.2d 792 (1977) (although agents had ample time after probable cause arose to obtain warrant, the failure to do so does not preclude a finding of exigent circumstances).[12] In Mitchell, agents were told by a reliable informant days in advance, the exact time and place that the illegal activity would occur. Closed circuit television cameras were even in place to photograph and record the arrest and seizure. Mitchell, 538 F.2d at 1234 (dissenting opinion). Mitchell and Cardwell both involved a car search which denotes a lesser expectation of privacy; however Mitchell has been extended to a warrantless entry and search of a home. See United States v. Gardner, 553 F.2d 946, 948 (5th Cir.1977), but cf. United States v. Thompson, 700 F.2d 944, 950 (5th Cir.1983). Unforeseeability has never been recognized as an element of the exigent circumstances exception and we decline to rule otherwise. Mitchell, supra, 538 F.2d at 1233, n. 3; see also United States v. Thompson, supra, 700 F.2d 944, 950 n. 4.
 
 
 80
 We note briefly that this is not a case where the exigent circumstances were deliberately created by the government. The agents here had to respond quickly after the vessel was seized by the Coast Guard; the act of sending in the decoy boat was an emergency act to prevent the smugglers awaiting the delivery from suspecting what had occurred. Thus, the agents could not have controlled the time at which the fake delivery took place, which is a necessary element to a finding that the government deliberately created the exigent circumstances. See United States v. Scheffer, 463 F.2d 567 (5th Cir.), cert. denied, 409 U.S. 984, 93 S.Ct. 324, 34 L.Ed.2d 248 (1972).VIII. Admission of Weapons
 
 
 81
 Although the government did not charge any of the defendants with any firearms offense, the weapons found in the search of the hotel rooms, including a sawed-off shotgun and pistols with silencers, were admitted into evidence. Appellants contend that the guns were inadmissible because they were not relevant to the commission of crimes with which they were charged. Fed.R.Evid. 401. In addition, they contend that even if the guns were relevant evidence, they were so prejudicial as to warrant their exclusion under Fed.R.Evid. 403. We disagree. The guns were relevant to prove appellants' intent to engage in a conspiracy to import marijuana and any possible prejudice that might have resulted from their admission was cured by the limiting instruction given by the trial judge upon the admission of each weapon.
 
 
 82
 Under Rule 401, evidence must be relevant to be admissible. In a large-scale, international smuggling venture such as this one, that involved twelve million dollars worth of marijuana, guns have become "tools of the trade" almost to the same extent as scales, cutting equipment and other paraphernalia. United States v. Wiener, 534 F.2d 15, 18 (2d Cir.), cert. denied, 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976) (a gun found in defendant's apartment on the day of his arrest for smuggling hashish is admissible). Because the weapons tend to prove the defendants' intent to promote and protect the narcotics conspiracy, they are relevant and admissible under Rule 401. See United States v. Marino, 658 F.2d 1120, 1123 (6th Cir.1981) (numerous guns found in defendant's suitcase during search of truck after drug bust were admissible as relevant evidence that he committed crimes with which he was charged even though not charged with firearms violation, where defendant found in possession of 3.7 million dollars worth of cocaine).
 
 
 83
 Appellants further contend that even if the guns are relevant, they should be excluded under Rule 403 because of their potential for prejudice. Since the guns are relevant to the crime charged, they should be excluded only if the risk of unfair prejudice outweighs their probative value. Fed.R.Evid. 403.
 
 
 84
 In order to protect the defendants from unfair prejudice, the judge gave a limiting instruction upon the admission of each weapon that the evidence should be considered not to show the character of the defendant, but only as proof of intent, operation, plan, knowledge or absence of mistake or accident. There is no evidence in the record that the weapons were introduced to show bad character. We hold that this limiting instruction properly protected the defendants from undue prejudice. See United States v. Marino, supra, 658 F.2d at 1124. We agree with the trial judge's finding that the probative value of the evidence outweighed its prejudicial effect.
 
 IX. Severance
 
 85
 Three appellants claim their motions to sever pursuant to Fed.R.Crim.P. 14 should have been granted. The decision to sever defendants properly joined for trial rests in the discretion of the trial court and is reviewable only for abuse. See United States v. Ritch, 583 F.2d 1179, 1181 (1st Cir.1978). A defendant seeking to overturn a lower court's ruling bears the burden of making a "strong showing of prejudice" from a joint trial that results in a miscarriage of justice. See United States v. Crooks, 766 F.2d 7, 10 (1st Cir.1985). We do not believe that appellants have met this burden.
 
 
 86
 The primary contention of the appellants is that they were comparatively minor figures in a complex conspiracy, and that there was a large disparity in the amount and strength of the evidence against all the defendants. However, the fact that the defendant plays a minor role and that a substantial portion of the evidence is not directly related to the defendant, does not make it "automatically unlawful to try him with more important figures" (emphasis in the original). United States v. Mahomud Rawwad, 807 F.2d 294, 295 (1st Cir.1986). There is a possible risk of prejudice that almost always exists when multiple defendants with different roles are tried together, but here defendants have failed to show anything greater. See United States v. Palow, 777 F.2d 52, 56 (1st Cir.1985). Furthermore, the trial court judge made clear to the jury in the instructions that they must consider the evidence separately against each defendant and on each count. See United States v. Luna, 585 F.2d 1, 5 (1st Cir.1978). Clearly, the jury was capable of following that instruction, for appellant Cresta was found not guilty on Count II of the indictment, and two defendants were acquitted altogether. See United States v. Ritch, supra, 583 F.2d at 1181. We believe that these jury instructions sufficiently safeguarded the appellants against "spillover" from their co-defendants' cases. See United States v. Mahomud Rawwad, supra, 807 F.2d at 296. This trial of ten defendants on a two-count indictment charging all of them with two closely related conspiracies arising out of the same events and evidence clearly called for a consolidated proceeding.
 
 
 87
 X. Prosecutor's Closing Argument and Rebuttal
 
 
 88
 Appellants contend that the prosecutor improperly vouched for the credibility of the government's witnesses and evidence in his closing argument and his rebuttal. Defense counsel made no objection during or after the prosecutor's two hour closing argument, or during the rebuttal. However, after the rebuttal had concluded, a motion for mistrial was made on this ground. The district court denied the motion, stating that the prosecutor's use of phrases such as "I believe" or "I suggest" was only in the context of what the evidence showed, and not as a personal assessment of the evidence. The court found that the prosecutor did not overstep the proper bounds of oral argument in any other respect either. The court instructed the jury at the beginning of all arguments, after the prosecutor's first closing and in its final instructions, that it was their recollection and evaluation of the evidence that controlled, and not the judge's, nor the attorneys' recollection.
 
 
 89
 There is an abundance of First Circuit case law holding it improper for the prosecutor to inject into his jury argument his personal beliefs about conclusions to be drawn from the evidence. See, e.g., United States v. Flaherty, 668 F.2d 566, 596 (1st Cir.1981); United States v. Gonzalez Vargas, 558 F.2d 631, 633 (1st Cir.1977); United States v. Farnkoff, 535 F.2d 661, 668 (1st Cir.1976); United States v. Capone, 683 F.2d 582, 586 (1st Cir.1982); United States v. Cain, 544 F.2d 1113, 1116 (1st Cir.1976). The principal concerns behind a prosecutor's expression of opinion is that, 1) it implies knowledge of information not before the jury and, 2) it places in issue the credibility of counsel, with the government holding a clear advantage. United States v. Rosa, 705 F.2d 1375, 1380 (1st Cir.1983).
 
 
 90
 Appellants object to three statements in the prosecutor's closing argument. The first statement is: "I think it would be ridiculous to draw any type of inference like that." The prosecutor was discussing the household scales that were found in the trunk of a car rented by one of the defendants. The prosecutor was arguing that the scales were intended for use in weighing the marijuana at the off-load site, and "certainly not to take as bathroom scales or for one to use as personal scales." The second statement is: "Again corroborating by pictures, actual photographs, let alone observations, everything basically that Montaner [government informant] is saying and while there obviously is some things that people are not right there listening, I would say that you will find here that the majority of everything that Montaner says not only is credible, everything he says, but most of it is corroborated by actual observation and pictures, ..." The third contested statement is: "I suggest Mr. Trundy [government witness] is believable but it's up to you to determine whether or not he was believable or whether or not his evidence was corroborated by other people."
 
 
 91
 This type of personal vouching continued, without objection, in the prosecutor's rebuttal:I just don't believe there is really any inconsistency at all. I don't think there is any question from the evidence, but it's for you to decide.... if you feel that I have told Mr. Trundy or anyone else in this case what to say and that they are coming forth because we have a hammer over their head, I ask you to find these defendants not guilty on that point. Because it would be a miscarriage of justice, and it would be totally against my obligation I have as an attorney for the government .... you have to determine whether or not you're satisfied so that the government put those witnesses on there. Would they put them on there if they knew they were lying? ...
 
 
 92
 These statements of the prosecutor are troublesome. They do not imply a knowledge of information not before the jury, but they do place in issue the government's credibility. The prosecutor's first comment in closing argument, regarding drawing an inference, is an expression of personal belief, but goes to such a minor aspect of the evidence that it could not have had an impact on the other evidence showing appellants' guilt. United States v. Flaherty, supra, 688 F.2d at 597. The remainder of the prosecutor's remarks were, however, undoubtedly improper. But, our analysis does not stop there. The remarks of the prosecutor are subject to the harmless error rule, Fed.R.Crim.P. 52(a) and must be evaluated in light of the circumstances of the trial. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 238-42, 60 S.Ct. 811, 851-53, 84 L.Ed. 1129 (1940); Patriarca v. United States, 402 F.2d 314, 321-22 (1st Cir.1968), cert. denied, 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969); Flaherty, supra, at 598. As this court stated in Patriarca, supra, at 322,
 
 
 93
 ... while the case depended wholly on the credibility of Baron's [here, Montaner's] testimony, all of the many factors which made it susceptible to impeachment were fully presented and fully argued. The occasional oblique expressions of opinion from both sides against the background of a long trial [here, 21 days of testimony], much evidence on the issue, and lengthy argument addressed to the evidence [here, a two hour closing argument with a half hour rebuttal] could not loom sufficiently large to have influence.
 
 
 94
 We must determine, looking at these improper remarks in the context of the trial as a whole, whether the misconduct was likely to have affected the trial's outcome. United States v. Capone, supra, 683 F.2d at 586-87. There are factors present here that neutralize the harm flowing from the prosecutor's remarks. Besides those factors stated above, including the length of the trial, the length of the closing arguments, and the full development at trial of the issue of credibility of the government witnesses, there is the key factor of the substantial evidence of appellants' guilt. Flaherty, supra, at 598; United States v. Ingraldi, 793 F.2d 408, 416 (1st Cir.1986); United States v. Cotter, 425 F.2d 450, 453 (1st Cir.1970). Another factor is the trial court's curative instructions, which were given before and after the closing arguments. Although they did not address these specific improper statements, they addressed the specific issue. See Therrien v. Vose, 782 F.2d 1, 4 (1st Cir.1986). And last, in regards to the improper statements in the rebuttal, the prosecutor is given somewhat greater leeway in rebuttal to rehabilitate his witnesses in response to defense counsel's inflammatory statements. Flaherty, supra; United States v. Rosa, supra, at 1379. Here, defense counsel described the government witness as a "bounty hunter," a "con artist," a "witness for hire" on four occasions, and twice as a "liar for hire." This factor does not exonerate the prosecutor, and we remind the prosecutor that the court is not condoning his actions.
 
 
 95
 In sum, the record reveals that the jury's verdict could hardly have been the result of these brief remarks of the prosecutor, but rather was based upon lengthy testimony, extensive corroborating evidence, and a reasonable belief that the government witnesses were credible. See United States v. Capone, supra, at 587. We therefore hold that the prosecutor's improprieties did not substantially prejudice the appellants and did not deprive them of their constitutional right to due process of law.
 
 XI. Jury Instructions
 
 96
 Finally, appellants contend that the trial court erred in its instructions to the jury on the substantive elements of the crimes charged against them. Because defense counsel failed to object at trial, the charge is reviewable on appeal only for plain error. See Fed.R.Crim.P. 52; United States v. Fusaro, 708 F.2d 17, 22 (1st Cir.1983). We summarily state, upon reading the charge, that it was clearly adequate and correct, and we see no merit in this claim.
 
 
 97
 The convictions are affirmed.
 
 APPENDIX
 
 98
 Excerpts from Montaner's testimony on cross-examination:
 
 
 99
 Q. Sir, you told several previous counsel that you hope to receive a financial reward, compensation, for your actions in this case?
 
 
 100
 A. Yes, sir.
 
 
 101
 Q. And you testified that the maximum amount of money you were about to receive or will receive is $50,000?
 
 
 102
 A. Yes, sir.
 
 
 103
 Q. And you expressed a little bit of concern about that because you wanted more?
 
 
 104
 A. I wanted what?
 
 
 105
 Q. You wanted more?
 
 
 106
 A. I didn't say that I wanted more. I said if more is available, I would like to get it, yes, sir.
 
 
 107
 Q. And has anyone indicated to you in writing or verbally from the United States Attorney's Office or from the DEA what has to happen in this case for you to receive full and total benefit of $50,000?
 
 
 108
 A. No, sir, none whatsoever.
 
 
 109
 Q. Did they indicate that if all these defendants are convicted, you will get $50,000?
 
 
 110
 A. Or if they are free perhaps I will be entitled to the same thing.
 
 
 111
 Q. What?
 
 
 112
 A. Either if they are convicted or they are innocent, I would be entitled to the same thing.
 
 
 113
 Q. Did they tell you that?
 
 
 114
 Q. They didn't tell me that one way or another. I expect that way.
 
 
 115
 Q. Oh, you are expecting no matter what the outcome of this case you are going to get $50,000?
 
 
 116
 A. Whatever the reward is going to be, yes, sir.
 
 
 117
 * * *
 
 
 118
 * * *
 
 
 119
 Q. But your understanding is the better you do, the better you testify, the more money you get at the end of the case?
 
 
 120
 Prosecutor: I am going to object to that, your Honor.
 
 
 121
 A. No, sir.
 
 
 122
 Prosecutor: That was not the witness' testimony on direct examination.
 
 
 123
 THE COURT: The objection is sustained.
 
 
 124
 * * *
 
 
 125
 * * *
 
 
 126
 Q. But you dream of what you're going to do with all that cash you're going to get after this case is over?
 
 
 127
 A. I just hope to start a new life and support my family and live with my family, yes, sir.
 
 
 128
 Q. Okay, and that's all dependent on how well you do here before Judge Gignoux and before the jury?
 
 
 129
 A. No, sir.
 
 
 130
 Q. Promises have been made you if your services are rendered, is that correct?
 
 
 131
 A. No, they never promised me that I was going to get something regarding my testimony.
 
 
 132
 Q. They told you, instead of a promise, they said they would recommend?
 
 
 133
 A. All right, okay, recommend.
 
 
 134
 Q. And there's a difference between "recommend" and "promise"?
 
 
 135
 A. Yes.
 
 
 136
 Q. But you know that they are--somebody in the federal government is going to recommend you for a large reward?
 
 
 137
 A. I hope so.
 
 
 138
 Q. No specific amount mentioned?A. No, sir.
 
 
 139
 Q. Just dependent on how well you do here?
 
 
 140
 A. No, sir.
 
 
 141
 Q. Okay. It's not depending on how well you do here?
 
 
 142
 A. Right. It is not depending on that.
 
 
 143
 Q. All right. It's going to be a specific amount of money?
 
 
 144
 A. I don't know.
 
 
 145
 Q. You have no idea?
 
 
 146
 A. No, sir.
 
 
 147
 Q. None whatsoever?
 
 
 148
 A. None whatsoever.
 
 
 149
 ALDRICH, Senior Circuit Judge (concurring).
 
 
 150
 While I concur in the result, and in most of the opinion, I regret to say that in one area the court fails to reflect what we said in our recent decision in United States v. Dailey, 759 F.2d 192 (1st Cir.1985), and says things that impermissibly (I do not understand that a panel can, simpliciter, overrule a prior decision) step back from it. Passing the lengthy quotation from United States v. Grimes, 438 F.2d 391 (6th Cir.1971), cert. denied, 402 U.S. 989, 91 S.Ct. 1684, 29 L.Ed.2d 155, which, I respectfully suggest, adds little to the opinion, as we have never committed ourselves to adopting the Sixth Circuit's position, I object to the court's reasoning. Shortly after the quotation from Grimes the court says,
 
 
 151
 [T]he agents who supervised Montaner made clear that the important factor in determining what he received was nothing more specific than the nature and extent of his cooperation.
 
 
 152
 This is what they may have made clear in court; they did not make it clear to Montaner. Rather, the court merely reasons that success had not been a condition on a prior occasion.
 
 
 153
 There was no reason then, for Montaner to believe his payment in this case would be contingent upon a conviction. Montaner's isolated statement was not the product of a government promise. [footnote omitted.]
 
 
 154
 This is to disregard our wise pronouncements in Dailey. In addition to saying "we can think of no instance in which the government would be justified in making a promised benefit contingent upon ... a guilty verdict," we there stated, "It is the government's duty ... to insure that all parties have a clear understanding of what each contingency provision means and what it does not mean." 759 F.2d at 201. It is only too apparent that the government failed to do this here. Thus, even if Montaner had not been promised, but nevertheless believed, that his benefits were contingent on the defendants' convictions, the government should bear the responsibility for the failure to make its arrangement clear.
 
 
 155
 I much regret that the court has watered this requirement down, both by its language and by its reasoning.
 
 
 156
 At the same time, though with reluctance, I accept the court's ultimate conclusion, based on the further testimony, that the record shows that Montaner did not really believe that a conviction would increase his receipts. On this basis I concur in the result. I trust, though, that in the future prosecutors will look carefully to Dailey's requirement of explicitness, and not consider language in the present opinion as a modification thereof.
 
 
 157
 WISDOM, Senior Circuit Judge, concurring.
 
 
 158
 I concur in the result and in almost all of the language of the opinion. I disagree only with certain language that might imply a retreat from this Court's holding in United States v. Dailey, 759 F.2d 192 (1st Cir.1985).
 
 
 
 *
 Of the Fifth Circuit, sitting by designation
 
 
 [1]
 There were eighteen original defendants. Upon motions for severance, three separate trials were held. This appeal stems from the trial of ten of the defendants, out of which two were acquitted, and one did not appeal
 
 
 [2]
 Montaner also received $30,000 from the Customs Service for giving information in an unrelated case during 1980 to 1983
 
 
 [3]
 Under Customs law, an informant is paid a "moiety" up to, but not exceeding, $50,000. Moiety is payment made to an informant who assisted in the seizure and ultimate forfeiture of an object. Here, the ADINA will be sold at an auction; Montaner has a claim to a portion of the proceeds, usually twenty-five percent, but not exceeding $50,000
 
 
 [4]
 The district court denied defendant's motion to suppress the testimony of Montaner. The court reasoned that, under Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), the government's agreement to pay an informant is not per se illegal. The district court did not address the issue of whether there was a permissible or impermissible contingent fee agreement, which is the analysis upon which we base our opinion
 
 
 [5]
 Appellant argues that Dailey mandates a written contingency agreement. We disagree. A written agreement is suggested as a better safeguard, but is not a per se requirement. See also United States v. Shearer, 794 F.2d 1545 (11th Cir.1986) (upholding admission of paid informant's testimony even though no written agreement)
 
 
 [6]
 Appellants rely heavily on the recent Fifth Circuit case, United States v. Cervantes-Pacheco, 800 F.2d 452 (5th Cir.1986) (en banc) (payment to informer dependent on informant's performance is impermissible contingent fee agreement). This case does not conform to the trend established in the First Circuit case law and thus we decline to follow it. See, e.g., United States v. Dailey, 759 F.2d 192; United States v. Palow, 777 F.2d 52; United States v. Jett, 491 F.2d 1078, 1081 (1st Cir.1974)
 
 
 [7]
 The present holding is based on Montaner's actual understanding of his agreement with the government. I do not see this holding as contravening Dailey, a point as to which this panel is in agreement. Since we are not faced with a situation in which, irrespective of the government's statement, Montaner nevertheless believed that his reward was contingent upon conviction of defendant, I see no need for considering the issues raised by Judge Aldrich in his concurrence
 
 
 [8]
 See Appendix for additional testimony
 
 
 [9]
 This sum does not include the $36,000 for relocation and subsistence, which is more in the nature of a necessity rather than a reward or incentive
 
 
 [10]
 We do not believe this testimony impacted any appellants other than Impemba and Carvajal, about whom it pertained. See United States v. Escobar, 674 F.2d 469, 476 (5th Cir.1982)
 
 
 [11]
 See infra for sufficiency of the evidence claim
 
 
 [12]
 See also Cardwell v. Lewis, 417 U.S. 583, 596, 94 S.Ct. 2464, 2472, 41 L.Ed.2d 325 (1974) ("The exigency may arise at any time, and the fact that the police might have obtained a warrant earlier does not negate the possibility of a current situation's necessitating prompt police action."); but cf. Niro v. United States, 388 F.2d 535, 539-40 (1st Cir.1968) (unless there are countervailing factors, a fully anticipated search and seizure cannot be justified by exigent circumstances)