UNITED STATES of America,

v.

**John Patrick HUGHES, Defendant.**

**No. Crim.A.99–10405–REK.**

United States District Court,
D. Massachusetts.

May 12, 2000.

Miriam Conrad, Office of the Federal Defender, Boston, MA, for John Patrick Hughes, defendant.

Theodore D. Chuang, U.S. Atty's Office, Boston, MA, for U.S.

### Opinion

KEETON, District Judge.

### I.

Pending for decision before this court are the following motions:

(1) Government's Application for Defendant's Drug Treatment Records (Docket No. 13, filed February 25, 2000). Defendant has filed an Opposition (Docket No. 21, filed March 8, 2000).

(2) Defendant's Motion to Strike Evidence (Docket No. 41, filed April 26, 2000). The government has filed an Opposition (Docket No. 42, filed April 27, 2000).

### II. Procedural History

On December 8, 1999, the grand jury returned a six-count indictment against John Patrick Hughes. Counts One, Two, and Three allege that on three separate

occasions the defendant made false statements in connection with the purchase of firearms, a violation of 18 U.S.C. § 922(a)(6). Counts Four, Five, and Six allege that on three separate occasions the defendant was a drug user in possession of a firearm, a violation of 18 U.S.C. § 922(g)(3).

On December 21, 1999, John Patrick Hughes pled not guilty to the charges in the indictment.

On February 25, 2000, the government filed an Application for an Order Authorizing and Requiring Disclosure of Drug Treatment Records (Docket No. 13) (hereinafter "Government's Application") seeking an order authorizing and requiring disclosure of all records pertaining to the admission, diagnosis, treatment, and release of John Patrick Hughes from three named drug treatment institutions. The government having placed the Indictment, its Application, its Memorandum of Law, and a proposed form of Order before the court, the court issued the proposed Order on February 25, 2000 (Docket No. 15). The institutions to which the Order was addressed delivered the described records to the U.S. attorney.

Thereafter, at a hearing of record on March 9, 2000, counsel for defendant Hughes objected to the issued Order of February 25, 2000, requested a hearing, requested an order requiring the records to be placed under seal pending the hearing, and requested a stay of enforcement of the Order of February 25, 2000 until the court has determined the outcome of the hearing. The court orally on the record allowed a stay of enforcement of the Order of February 25, 2000 until the court has determined the outcome of the hearing, and set the hearing for March 14, 2000.

At the hearing of March 14, 2000, both the government and defense counsel brought to the court's attention the requirement that under 42 U.S.C. § 290dd–2 the drug treatment records sought "may only be disclosed and used to substantiate criminal charges against a patient pursuant to a court order or under specific circumstances," 42 U.S.C. § 290dd–2, and that before issuing such an order, the court must find that "all of the following criteria" have been met:

(1) The crime involved is extremely serious, such as one which causes or directly threatens loss of life or serious bodily injury including homicide, rape, kidnapping, armed robbery, assault with a deadly weapon, and child abuse and neglect.

(2) There is a reasonable likelihood that the records will disclose information of substantial value in the investigation or prosecution.

(3) Other ways of obtaining the information are not available or would not be effective.

(4) The potential injury to the patient, to the physician-patient relationship and to the ability of the program to provide services to other patients is outweighed by the public interest and the need for disclosure.

42 C.F.R. § 2.65. The government acknowledged also that under 42 C.F.R. § 2.65(d)(5)(i) the court must find that the person holding the records has been given notice of the application and afforded the opportunity to be represented by independent counsel.

At the hearing of March 14, 2000, the court heard argument and decided that, under 42 C.F.R. § 2.65, before any contested issues are decided regarding the application for disclosure, the court must give notice to the persons holding the records that each of them will be afforded the opportunity to be heard on the government's application for their disclosure. The government conceded during that hearing, that the persons holding the records were not afforded the precise form of notice prescribed in 42 C.F.R. § 2.65(d)(5). See 42 C.F.R. § 2.65(d)(5) (stating that for a court to order the disclosure of drug treatment records for the purpose of substantiating criminal charges against a pa-

tient, the government must show that (i) "[t]he person holding the records has been afforded the opportunity to be represented by independent counsel; and (ii)[a]ny person holding the records which is an entity within Federal, State, or local government has in fact been represented by counsel independent of the applicant"). I concluded, therefore, that all persons holding the records at issue should be given proper notice and should have the opportunity to be represented by independent counsel at a hearing before this court. I concluded also that, in compliance with the regulations, I would order no enforcement of the Order of February 25, 2000 until after the notice, a hearing, and an opportunity to be heard. *See* Docket No. 26 (Memorandum and Order of March 14, 2000).

On April 12, 2000, after proper notice was issued to all persons holding the drug treatment records, the court held a hearing concerning the required showing under 42 C.F.R. § 2.65. In addition to the government and defense counsel, counsel for two of the three persons holding the drug treatment records were present and had the opportunity to be heard on the Government's Application. The government offered the affidavit of Special Agent William Murphy (Docket No. 39) with the Department of Treasury, Bureau of Alcohol, Tobacco and Firearms. The defense objected to the affidavit on hearsay grounds. The court sustained the defense's objections to only the following paragraphs: 7, 13, 28, 29, 30, 31, 32, 33, 35, 36. Defense's objections to the remaining paragraphs were overruled. Then, the government called Agent Murphy to the stand to receive into evidence his direct testimony.

The outcome of the April 12, 2000 hearing left issues to be resolved that depended upon factual findings I could not make without receiving further evidence. An evidentiary hearing was scheduled for April 27 and 28, 2000, at which time all interested parties would be offered the opportunity to present evidence.

At the evidentiary hearing on April 27, 2000, the government re-called the case agent, Agent Patrick Murphy, to the stand so defense counsel could proceed with her cross-examination of him. After a short re-direct examination, the court recessed for the day at noon.

The following day, April 28, 2000, defense counsel called, among other witnesses, Officer Larry Calderone and Sergeant Brian Fleming to the stand. Direct and cross-examination proceeded until completed. The court then heard argument and took the matter under advisement. The testimony that the court received during the three-day hearing that is relevant to the court's determination of the Government's Application is recited in Part III below.

### III. Testimony

### A. Introduction

Beyond dispute, the defendant purchased firearms on the three separate occasions listed in the indictment against him. His ATF applications to purchase firearms, filled out at Roach's Sporting Goods in Cambridge, Massachusetts, where he purchased the firearms at issue in this case, have been entered into evidence as Government's Exhibits 1–5. Defense has offered no evidence that would challenge the authenticity of these documents.

Factual disputes that I must decide in order to rule on the Government's Application for an Order Authorizing and Requiring Disclosure of Drug Treatment Records do exist, however. Principally, if not entirely, they are the following: (1) the defendant's alleged connection with Till Freeman, a man, who, when arrested on October 28, 1999 on charges of assault with a deadly weapon and carjacking, was carrying one of the firearms purchased by the defendant at Roach's; and (2) the government's allegations that the defendant was engaging in the "straw purchasing" of firearms when, on June 17, 1999, he was ac-

companied by two unidentified males and purchased seven firearms from Roach's.

The government contends that the evidence shows that defendant was buying firearms under circumstances that were indicative of a straw purchase and that at least one of these firearms ended up in the hands of Till Freeman, a convicted felon. This, the government asserts, satisfies the contested prongs of the regulation at issue: that the crimes charged against the defendant—making a false statement in connection with the purchase of a firearm and possession of a firearm by a drug user—are "extremely serious" crimes (see 42 C.F.R. § 2.65(d)(1)) and that the injury to the patient, the physician-patient relationship and to the ability of the program to provide services to other patients due to the release of the drug treatment records are outweighed by the public interest and need for their disclosure in this case in aid of prosecution on the merits of the charges in the indictment (see 42 C.F.R. § 2.65(d)(4)).

Defendant challenges the sufficiency of the government's showing. Defendant argues that the crimes for which John Patrick Hughes has been indicted have not been shown to be "extremely serious" crimes "such as one[s] which cause[ ] or directly threaten[ ] loss of life or serious bodily injury including homicide, rape, kidnapping." 42 C.F.R. § 2.65(d). Defendant adds that his only uncontroverted connection with Till Freeman, a man who, unlike John Patrick Hughes, was arrested for "directly threatening loss of life or serious bodily injury" (but which charges have since been dropped), is that Till Freeman possessed a gun that Hughes had purchased six months earlier. And the evidence proffered in support of government's argument that defendant was engaged in straw purchasing is contradicted by the one witness who testified to the circumstances of the purchase at Roach's. This, the defense suggests, is not enough to surmount the high hurdle erected by 42 C.F.R. § 2.65(d).

## B. The "Straw Purchase"

Only Agent Murphy testified to the circumstances of the firearms purchase that the government alleges was indicative of a "straw purchase."

Agent Murphy's testimony was based on his memory of his interviews with Roach's employees, Mr. Eng, Mr. Charles Callanan Jr, Mr. Charles Callanan Sr., and Jeremy Lowe, reports he wrote concerning the interviews, and a scattering of notes that he took during the interviews. Some interviews were conducted in person at the store and others were conducted over the phone. Agent Murphy's memory for dates and times of the interviews was not clear in some significant respects.

Agent Murphy testified that Mr. Eng told him that on June 17, 1999, John Patrick Hughes approached the counter at Roach's sporting goods and told Mr. Eng that he wanted to look at handguns under $400.00 each. Agent Murphy testified that Mr. Eng said that Hughes quickly pointed out seven of the handguns that Mr. Eng had selected, saying "I'll take that, I'll take that, I'll take that." Agent Murphy further testified that Mr. Eng said that Mr. Hughes did not ask any questions about the firearms he was purchasing and that he did not inspect the firearms before he purchased them. Agent Murphy said that Mr. Eng told him that Hughes paid in cash for all seven of the handguns.

Agent Murphy also testified that Mr. Eng stated that Hughes was accompanied by two unidentified males. Mr. Eng did not provide any kind of description of these males, however. He did not say whether he remembered their height, hair color, race, or age. The only thing that Agent Murphy said that Mr. Eng remembered about these two unidentified males was that they indicated that they did not have licenses to carry firearms and that they were with Mr. Hughes. Under cross-examination, however, Agent Murphy admitted that this information that he re-

membered that Mr. Eng provided about the unidentified males was not in the report about the interview with Mr. Eng. The only information about the two unidentified men that is contained in a report of interviews that Agent Murphy conducted with Roach's employees is in a report about the interview with Mr. Callanan Jr., not Mr. Eng. That report indicates that when asked by Mr. Callanan Jr. to see their licenses to carry, contrary to what Mr. Murphy testified to, the two unidentified men did not say anything. The report further indicates that it was Mr. Hughes who replied to the question, saying that the two men were with him. After much cross-examination, redirect and recross on this subject, Agent Murphy's testimony regarding which Roach's employee indicated whether the two unidentified men said anything at all became more and more confused. Even with the aid of his reports and his written notes taken at the time of the interviews, Agent Murphy could not provide any more details about the two unidentified men and could not clarify the discrepancy between his report and his testimony other than to say that he did not see it as much of a discrepancy.

At issue throughout Agent Murphy's testimony was how Agent Murphy came to "know" the information to which he was testifying. This was the reason for defense counsel's hearsay objection, which I sustained in part, at the beginning of the hearing when the government offered into evidence Agent Murphy's affidavit. As he continued with his testimony, it became clear that much of what Agent Murphy was testifying to regarding what the government alleges was indicative of a "straw purchase" came from what Mr. Eng, Mr. Callanan Jr., and Mr. Callanan Sr. said that they saw and heard the night of June 17, 2000, which was recounted to Agent Murphy during interviews conducted over a course of weeks but of which Agent Murphy had sparse notes, admittedly incomplete reports, and at times an inconsistent memory.

At one point, Agent Murphy pointed out to the court and the defense attorney that the date on the report of the interview with Mr. Callanan Jr. was incorrect. That report stated that during the interview with Mr. Callanan Jr., Mr. Callanan Jr. stated that Mr. Hughes came to Roach's on June 21, 1999 with two unidentified men and purchased seven firearms. Under cross-examination Agent Murphy explained that this date should have been June 17, 1999. Murphy testified that Hughes could not have been in Roach's on June 21, 1999, because on that date he was under surveillance by East Bridgewater police in East Bridgewater and was later arrested. Furthermore, the ATF firearm applications from Roach's indicates that Hughes purchased the firearms in question on June 17, 1999. Agent Murphy explained the discrepancy as a typographical error on his part. But when pushed to review his notes from the interview with Mr. Callanan Jr. to see if they indicated the date about which Mr. Callanan Jr. was talking with Mr. Murphy, his notes indicated only "7:30 p.m."; his notes did not indicate a date of any kind.

## C. The Freeman Connection

Agent Murphy testified that the only two connections of which he was aware between Till Freeman and the defendant were the following: (1) that on June 21, 1999, Detective Allen from the East Bridgewater Police department saw Mr. Hughes on Plain Street in Brockton, the street on which Till Freeman's last known address is located; and (2) that when Freeman was arrested on October 28, 2000, he was in possession of one of the firearms that Hughes had purchased at Roach's on the night of June 17, 1999. Agent Murphy further testified in his affidavit that when the defendant was arrested on the night of June 21, 1999 for driving without a license, the defendant explained to Agent Murphy that after purchasing the firearms at issue, he stored them at a friend's house in Brockton. Agent Mur-

phy further stated in his affidavit that the defendant told him that on June 16, 1999 those firearms were stolen from his friend's house in Brockton.

The other testimony regarding Till Freeman came from Officer Calderone and Sergeant Fleming, two Boston Police Officers who were involved in the arrest of Till Freeman and thus in the recovery of one of the firearms that Hughes purchased at Roach's. Neither Officer Calderone nor Sergeant Fleming testified to any connection between Freeman and Hughes. They testified only to the circumstances of the arrest of Till Freeman on October 28, 1999.

Officer Calderone testified that on October 28, 1999, he was called to 295 Center Street in Jamaica Plain where a man who said his name was Julio Agusto was alleged to have been robbed and carjacked. At the scene, Mr. Agusto told Officer Calderone that at 3:15 p.m., when he was on his way to buy liquor at the store on the corner of Seaver Street and Blue Hill Avenue, a stranger, a man who was later identified as Till Freeman, forced him at gunpoint into Agusto's car and told him to drive to Mr. Agusto's house. Officer Calderone said that Mr. Agusto told him that the two men then drove to 295 Centre Street in Jamaica Plain, which was not Mr. Agusto's home, and that Mr. Freeman then robbed Mr. Agusto of $500.00 and fled on foot.

Officer Calderone then testified that the interview with Mr. Agusto continued immediately afterwards, back at the police station. Once at the station, Mr. Agusto changed his story. He said that he was at the corner of Seaver Street and Blue Hill Avenue not to purchase liquor but to engage in a drug transaction with Mr. Freeman. Officer Calderone testified that Mr. Agusto volunteered this new version of the events at the station in response to further questioning by the police officers present. Mr. Agusto told Officer Calderone that when the drug transaction did not take place as planned, Freeman forced Agusto at gunpoint into his car and they drove to 295 Centre Street where Freeman got out of the car and ran away.

This new version of events was not contained in any police report of the incident, and thus the first that the defense heard of it was under cross-examination of Agent Murphy on April 27, 2000. Agent Murphy stated that he first heard of it the morning of April 27, 2000, when he was on a conference call with Officer Calderone and U.S. Attorney Chuang, the prosecutor in this case. When defense called Officer Calderone to testify the following day, Officer Calderone testified that the drug transaction, and Mr. Agusto's recanting of his original story about purchasing liquor and not knowing Mr. Freeman, was not in the police report because he was instructed by his supervisor, Sergeant Fleming not to include it.

When asked on direct examination about the omission in the police report written by the officers under his supervision, Sergeant Fleming at first stated that he would never advise his officers to intentionally omit something from a police report. Later, under cross-examination, Sergeant Fleming indicated that his memory was becoming clearer about the writing of the police report and that he might have told his officers not to include anything about the drug transaction if it was just a supposition on their part that drugs were involved. Sergeant Fleming testified that he was not present during all of the interview with Mr. Agusto; he did not know that Officer Calderone claimed not to be making a supposition but to be recounting to his supervisor what Mr. Agusto had in fact told him about the drug transaction. Both Officer Calderone and Sergeant Fleming testified that to their knowledge, and according to the police report, no drugs were found on either Till Freeman or Julio Agusto and that only $240.00 was found on Till Freeman. U.S. Attorney Chuang represented to the court that Till Freeman's fingerprints were not found in Mr. Agusto's car.

The interview with Julio Agusto ended when Mr. Agusto asked to leave the room to get a soda. The officers permitted him to do so but then he never returned to the interview room or to the station house. Officer Calderone, Sergeant Fleming and Agent Murphy all testified that no one has been able to verify any of the personal information Julio Agusto gave to the police on October 28, 1999, not his name, his address or his date of birth.

Officer Calderone also testified that the only witness to Mr. Agusto's being abducted at gunpoint from the corner of Seaver Street and Blue Hill Avenue was Mr. Agusto's girlfriend. Officer Calderone did not interview Mr. Agusto's girlfriend, however, and the results of the interview with her by others do not appear in the police report of the incident. When defense counsel showed Officer Calderone the blank space in the police report where witnesses to the alleged crime were supposed to be listed, Officer Calderone could not explain why that space did not contain the name of Mr. Agusto's girlfriend. Officer Calderone also testified that he spoke with Mr. Agusto's girlfriend at 295 Centre Street and that she told him that Mr. Agusto had been held at gunpoint as he had said. It was not clear from Officer Calderone's testimony, however, how Mr. Agusto's girlfriend witnessed the alleged abduction from Seaver Street and Blue Hill Avenue and then was also at 295 Centre Street in Jamaica Plain to witness events and recount her witnessing of the abduction from Seaver Street to the police officers in Jamaica Plain.

Agent Murphy testified that Officer Calderone told him that he interviewed a female witness, whose name Agent Murphy could not remember, who worked in the office building at 295 Centre Street. Agent Murphy testified that Officer Calderone told him that the female witness saw a man, later identified as Till Freeman, bending over a wastebasket in the building at 295 Centre Street. When she asked him if she could help him, she said that he pointed a gun at her and said "No, ma'am" and then left the office. At the prompting of U.S. Attorney Chuang, Agent Murphy recalled her name as Florri Niane. Officer Calderone testified under direct examination that her name is contained in the police report as a witness at the scene of the alleged crime. Officer Calderone also testified that she was not the woman who said that she was Mr. Agusto's girlfriend.

Agent Murphy testified that Till Freeman is being prosecuted in federal court for the crime of a felon in possession of a firearm and that to his knowledge Mr. Freeman is not being prosecuted for the alleged car jacking or assault.

## IV. Testimony Examined in Light of the Legal Standard

### A. Introduction

Under 42 C.F.R. § 2.65, a court may authorize the disclosure of drug treatment records for the purpose of conducting a criminal investigation or prosecution of a patient, such as those being requested in this case, "only if the court finds that *all* of the [four] criteria are met." 42 C.F.R. § 2.65(d) (emphasis added). I read this regulation as stating that if the government fails to meet any of the four criteria, a court must not authorize the disclosure of the drug treatment records. In light of the testimony proffered during the three-day evidentiary hearing, the relevant parts of which are summarized above in Part III, I find that the government has failed to meet at least two of the four criteria. I explain the reasons for this finding below.

### B. Presumption Against Disclosure

Little case law exists concerning the purpose and application of 42 C.F.R. § 2.65. The case law of which I am aware, in this circuit, describes the statute at issue and the governing regulations as "carry[ing] a strong presumption against disclosing records of this kind." *United States v. Cresta*, 825 F.2d 538, 551–52 (1st Cir.1987). The Court of Appeals for the

First Circuit considers it to be the "express purpose of [42 C.F.R. § 2.65] to encourage patients to seek treatment for substance abuse without fear that by doing so, their privacy will be compromised." *Id.* at 552. In enacting the legislation at issue, Congress issued a Report that contained a separate and specific provision, under the heading "Confidentiality of Patient Records," that memorialized their finding of the requirement for the confidentiality of patient records in the successful treatment of drug abuse.

> The conferees wish to stress their conviction that the strictest adherence to the provision of this section is absolutely essential to the success of all drug abuse prevention programs. Every patient and former patient must be assured that his right to privacy will be protected. Without that assurance, fear of public disclosure of drug abuse or of records that will attach for life will discourage thousands from seeking the treatment they must have if this tragic national problem is to be overcome.

H.Conf.Rep. No. 92–920, 92d Cong., 2d Sess, reprinted in 1972 U.S.Code Cong. & Admin.News, 2072. *See also* Testimony of Legal Action Center before the Subcommittee of the Committee on Government Operations on the H.R.4077, The Fair Health Information Practices Act of 1994 (May 5, 1994), 1994 WL 232739 (F.D.C.H.) (discussing the continued viability of 42 C.F.R. § 2.65 and the presumption it carries against disclosure even in the wake of newly proposed legislation that might weaken the federal protection currently afforded substance abuse patients; proposed legislation—Fair Health Information Practices—was never passed).

The testimony in evidence suggests that the defendant was in and out of drug treatment centers over the course of several years. Some of the testimony from Agent Murphy, for example, concerning the defendant's brother Jason, indicates that his family would aid him in his attempts at rehabilitation. The legislative history of the statutory scheme at issue here indicates that Congress intended to deal with the nation's drug problems "in facilitating the work of drug and alcohol treatment centers by assuring the confidentiality of its patients." *United States v. Eide,* 875 F.2d 1429, 1436 (9th Cir.1989). In other words, the rationale behind the patient-protective scheme of 42 C.F.R. § 2.65 is to encourage people with drug problems to seek treatment. The heavy burden the government must carry in a case like this serves the laudatory, and what Congress deems to be the necessary, purpose of facilitating the work of the drug treatment centers that service the defendant, and others like him.

## C. The Crime Involved is Not "Extremely Serious" Under 42 C.F.R. § 2.65(d)(1)

█ The parties take divergent positions on how this court should understand section 2.65(d)(1). Defense asks that I take a categorical approach to the regulation's labeling of "extremely serious" crimes as those enumerated in section 2.65(d)(1), *i.e.,* homicide, rape, kidnaping, armed robbery, assault with a deadly weapon, and child abuse and neglect. Defense argues that the crimes involved in the present case—making a false statement in connection with the purchase of a firearm and the possession of a firearm by a drug user—are not treated as crimes of violence in other legal contexts and thus should not be treated as "extremely serious" crimes, like those violent crimes listed, for the present purposes. The government argues that the usual reasons for taking a categorical approach—where a court is loath to delve into the underlying facts of a case, such as a state court conviction, which may or may not have an effect on federal sentencing—are not present here. In this situation, the government asserts, the underlying facts are the exact facts that are part of the case at hand and the regulation calls for the court to make a finding as to the nature of those

facts in order to weigh them against the good reasons for keeping the records confidential.

Considering the testimony in evidence alongside the four prongs of the regulation, I conclude that under both a categorical approach and a fact-specific approach the government has failed to meet its burden. Thus, I need not and do not purport to decide that only one or the other of these approaches is the proper one.

Section 2.65(d)(1) states in full:

The crime involved is extremely serious, such as one which *causes or directly threatens loss of life or serious bodily injury* including homicide, rape, kidnaping, armed robbery, assault with a deadly weapon, and child abuse and neglect.

42 C.F.R. § 2.65(d)(1) (emphasis added). The language of the regulation explicitly links the words "extremely serious" with "causing or directly threatening loss of life or serious bodily injury." "Extremely serious" crimes, then, according to the regulation, have a direct causal connection to occurrences and manifestations of physical violence. The only evidence that the government proffers to show such a direct causal link between the crime involved and physical violence is the testimony regarding Till Freeman and his alleged assault, with one of the guns purchased by Hughes, on Julio Agusto.

The government argues that the arrest of Till Freeman while in possession of a firearm that was bought by the defendant six months earlier demonstrates how serious the crimes involved here are, even though the crimes of making a false statement in connection with purchasing a firearm and possession of a firearm by a drug user do not, by themselves, cause or directly threaten loss of life. I understand the government to be arguing that I should find that it was reasonably foreseeable that these crimes would lead to physical violence and thus defendant's alleged criminal conduct should be considered "extremely serious" for the purposes of satisfying section 2.65(d)(1) in this case. Al-though the government does not charge Mr. Hughes with trafficking in firearms, for example, the government asks that I conclude that the circumstances of the purchases of the firearms demonstrate that Hughes was, in fact, buying firearms to then sell them, and perhaps, to finance his drug habit. In this day and age, the government says, guns that are purchased in this fashion end up in the hands of persons who have serious criminal records or for other reasons are likely to use them in very dangerous ways, thus posing significant dangers and a threat to society.

The government's rhetoric strays far from the language of the regulation. The regulation requires that I make a finding that the *crime involved* "causes or directly threatens loss of life ..." The crimes involved are making a false statement while purchasing a firearm and the possession of a firearm by a drug user. Neither of these crimes, allegedly committed by John Patrick Hughes, has been shown by testimony in evidence to have caused or directly threatened loss of life. To find that the government has met the requirement set forth by the regulation's language, I would have to be able to make a finding, based on the testimony in evidence, that Mr. Hughes sold the firearm found on Till Freeman to Till Freeman and that it was reasonably foreseeable to Mr. Hughes when he did so that Till Freeman would use the firearm in a way that would cause or directly threaten loss of life or serious bodily injury. The testimony in evidence regarding the arrest of Till Freeman is sufficiently contradicted and unclear that I am unable to make such a finding. The man who accused Till Freeman of the assault, Julio Agusto, cannot be found, his name and other personal information cannot be verified, and when questioned at the police station about the incident, he changed some of the details of the story he told to the police at the scene of the alleged assault. He then apparently left the police station under false pretenses and fled. The only other witness to the alleged

assault and kidnapping by Till Freeman is Mr. Agusto's alleged girlfriend, whom some police officers interviewed, but whose testimony is not before me. And, according to the policemen who wrote the report on the alleged assault, her name, as a witness, does not even appear in the appropriate "witness" box on the police report of the incident in Jamaica Plain.

In addition, the testimony of Agent Murphy regarding what the government alleges to be a "straw purchase" at Roach's, is also considerably confused and patchy. I cannot find that the circumstances of the firearms purchase were what the government alleges them to be—a man hastily buying firearms, for two unidentified companions who may or may not have had licenses to carry firearms, that were to be used in the foreseeable future in dangerous and threatening ways.

Finally, I conclude that it would be inappropriate to find that the crime of possession of a firearm by a drug user is an "extremely serious" crime in the circumstances of this case.

### D. The Public Interest and the Need for Disclosure in this Case Do Not Outweigh the Potential Injury to the Patient, to the Physician–Patient Relationship, and to the Ability of the Program to Provide Services to Other Patients

At the April 12, 2000 hearing, representatives for two of the three drug treatment centers from whom records have been requested appeared before the court to be heard on the Government's Application. Both representatives made clear to the court, before their arguments, that they were in no way representing to the court that the defendant, John Hughes, was in fact a patient for drug addiction at either of the centers. The representatives were present to represent their clients because the U.S. Attorney subpoenaed records concerning Mr. Hughes from the centers and the centers wished to be heard on the policy of disclosing drug treatment records, in general, for the purposes of criminal prosecution. Their arguments address the fourth prong of the C.F.R. scheme at issue in this case, which may be described as the "public policy" prong. As I have previously noted in section IV.A. above, a strong presumption against disclosure of these kinds of records is inherent in the statutory scheme at issue. Some reasons for that presumption were explained at the April 12, 2000 hearing and are restated directly below.

Mr. Bourgeois, representing AdCare Hospital, explained his client's concern that the process by which an individual reaches out for help with his or her drug or alcohol addiction ought not to be used as proof of his or her status as an addicted person, a status that could send the person to jail for doing otherwise legal activities, such as possessing a firearm or driving a car. The court in authorizing such a disclosure to prove an element of an offense, Mr. Bourgeois contended, would have a dramatic chilling effect on AdCare's business of being a haven and a step toward a cure for substance abusers.

Mr. Shrier, representing Rehabilitation and Health, stressed that his client was extremely concerned that the disclosure of records for criminal prosecution would discourage current patients and future patients from seeking treatment. He also stated that his client would urge that courts rely on specific findings on a case-by-case basis for the necessity of the disclosure of records in order to prevent physical injury, for example, and would be afraid of the effects on drug treatment centers should courts make general rules for the disclosure of records instead of specific findings based on the particular circumstances of the cases before them.

In representing the drug treatment centers, both Mr. Shrier and Mr. Bourgeois make arguments that parallel what the First Circuit has described as the purpose for the confidentiality protections written into 42 U.S.C. § 290dd–2 and 42 C.F.R.

§ 2.65. *See United States v. Cresta*, 825 F.2d at 551–52. *See also Whyte v. Connecticut Mutual Life Insurance Co.*, 818 F.2d 1005, 1009–10 (1st Cir.1987) (stating that the purpose of the related statute protecting the confidentiality of records concerning alcoholism treatment is "an indispensable prerequisite to successful alcoholism research ... [and] ... treatment" and that "[w]ithout guarantees of confidentiality, many individuals ... would be reluctant to participate fully in alcoholism programs"). In addition to their arguments that the presumption of confidentiality facilitates the work of the treatment centers, it seems reasonable to assume that it is the very nature of the treatment centers' staunch and protective stand with regard to their patients' privacy that encourages some in more troubled populations—"populations who have been traditionally suspicious of government programs, medical services and other institutions"—to seek the help they need. *See* Testimony of the Legal Action Center before the Subcommittee of the Committee on Government Operations on the H.R.4077, The Fair Health Information Practices Act of 1994 (May 5, 1994), 1994 WL 232739 (F.D.C.H.) (testifying to the reasons for and effectiveness of the confidentiality provisions in 42 C.F.R. Part 2).

For all of these reasons, I cannot make the finding that the government asks of me. I cannot find that the government has satisfied its burden of demonstrating that the "potential injury to the patient, to the physician-patient relationship, and to the ability of the program to provide services to other patients is outweighed by the public interest and the need for disclosure." 42 C.F.R. § 2.65(d)(4).

## V. Defendant's Motion to Strike Evidence (Docket No. 41)

██ Defendant has moved to strike any and all reference to statements made by Dr. Paul Lemieux, the treatment director at AdCare Hospital, from the record that I must consider in deciding the Government's Application. In support of its motion, defendant says that according to Mr. Bourgeois, counsel for AdCare, the statements at issue would not have been made but for the court's order disclosing the drug treatment records, the order that was subsequently stayed pending resolution of the Government's Application after the evidentiary hearing. According to Mr. Bourgeois, *see* Letter from Mr. Bourgeois to Defense Counsel attached to Docket No. 41, he would not have authorized Dr. Lemieux to speak with Agent Murphy at all had the order not been in effect at the time of the interview.

It does not follow, however, that I should not consider Agent Murphy's testimony (and affidavit) about the out-of-court statements of Dr. Lemiuex to him for any purpose. In pretrial proceedings, including motion hearings of the unusual kind I have held in this instance, hearsay evidence is often received and considered by the courts, even though with sensitivity to its hearsay nature as bearing on the weight accorded to it in the court's decisionmaking. I find it appropriate to take this evidence into account in evaluating the scope and limits of the government's investigation, and especially that part conducted by Agent Murphy. For these reasons, I will deny the defense motion to strike.

During oral argument on this motion, defense counsel urged the court not to consider in its rulings on the merits of the Government's Application what she characterized as a "windfall" to the government as a result of a court order that was issued, and then later stayed pending a thorough consideration of the evidence proffered. The stay, defense argues, was intended to return the parties to the status existing before the order was issued. Defense counsel also argued, however, that the information disclosed by Dr. Lemieux was not material to the issues the court has to decide with respect to the Government's Application.

I find merit in the defense position that the information in evidence through Agent Murphy's affidavit (in particular, para-

graphs 37 and 38 of Docket No. 39) regarding Dr. Lemieux's statements has no significant bearing on the rulings that I must make concerning prongs one and four of 42 C.F.R. § 2.65(d). Were I to find that the government has met its burden with regard to prongs one and four, and were I thus pressed to analyze the evidence in relation to prong two—*i.e.,* whether a reasonable likelihood exists that the records will disclose information of substantial value in the investigation—Dr. Lemieux's testimony might have significant bearing on my determinations of law and fact in relation to prong two. But, in denying the Government's Application, I found that the government has not met its burden on prongs one and four. In these circumstances, I need not consider the merits of prong two. Thus, defendant's motion to strike any and all references to statements made by Dr. Lemieux is now moot as to prong-two issues.

Because of the bearing of this hearsay evidence in other respects identified above, however, I will deny the defense motion to strike.

### ORDER

For the reasons stated in the foregoing Memorandum, it is ORDERED:

(1) Government's Application for Defendant's Drug Treatment Records (Docket No. 13, filed February 25, 2000) is DENIED;

(2) Defendant's Motion to Strike Evidence (Docket No. 41, filed April 26, 2000). is DENIED.